Arthur H. **TAPLEY** and Betty Tapley, et al., Plaintiffs,

v.

**UNITED STATES of America, Defendant.**

Ray L. **LATHEM** and Sylba R. Lathem, Plaintiffs,

v.

**UNITED STATES of America, Defendant.**

Nos. LR–C–83–954, LR–C–84–281.

United States District Court, E.D. Arkansas, W.D.

Feb. 20, 1986.

---

Comer Boyett, Jr., Searcy, Ark., for plaintiffs.

George W. Proctor, U.S. Atty. by Richard M. Pence, Asst. U.S. Atty., Little Rock, Ark., for defendant.

### MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, Jr., District Judge.

Plaintiffs, Arthur H. Tapley, age 60, and Betty Tapley, age 51, husband and wife, individually and as parents and next friends of Lisa Tapley, a minor daughter,

age 18, and Steven Tapley, age 21; Ray L. Lathem, age 62, and Sylba R. Lathem, age 56, husband and wife, have brought this civil action against the United States of America, pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and § 2671, *et seq.*, seeking monetary damages for personal injuries and loss of personal property resulting, purportedly, from the exposure to nitrogen tetroxide, a toxic chemical, as a consequence of an explosion at a Titan II Missile site near Damascus, Van Buren County, Arkansas, on September 19, 1980, at approximately 3:00 o'clock a.m.[1] The missile complex is maintained by the United States Air Force.

After carefully considering the evidence proffered by the litigants, memoranda and proposed findings of fact and conclusions of law submitted by counsel, the Court now makes its findings of fact as follows:

### I.

1. An intercontinental ballistic missile located in Missile Complex 374–7, which is located 3.6 miles north of Damascus, Arkansas, developed a low pressure fuel condition, in the stage II oxidizer tank, on September 18, 1980. Air Force personnel, propellant transfer system team (PTS), consisting of eight individuals, all of whom were trained and qualified in the task to be performed except for Airman Plumb and Airman Aderhold, were dispatched to correct the problem. There had been a similar malfunction at least two days earlier.

2. Airman Plumb was receiving on-the-job training under proper supervision. Airman Aderhold, who was not trained for the relevant task, was performing the function of "protective clothing" and "equipment support".

Senior Airman David F. Powell, a team member, and Plumb went to "silo level 2 on lower maintenance platforms inside the launch duct . . ." Powell proceeded into the launch duct with a ratchet wrench and socket connected to each other as he found them when he arrived at the complex.[2] Powell did not examine the socket to determine if it were secured to the ratchet wrench.

At the time, Air Force Technical Order 21M–LGM25C–2–12 of December 7, 1979, which became effective on April 2, 1980, required the use of a torque wrench and socket to remove the oxidizer vent pressure cap from the stage II oxidizer tank in the maintenance task. Prior to Technical Order 21M–LGM25C–2–12, as well as in the instant assignment, a ratchet wrench and socket were used.

While in the process of fitting the socket on the pressure cap, the socket, weighing approximately nine pounds, disengaged from the ratchet wrench and fell through an opening between the platform segment, a deck for PTS team to stand on, and the missile striking a part of the missile, stage I, approximately 66 feet below, puncturing the missile and resulting in the emission of missile fuel "in a stream the size of a garden hose or larger." The PTS team, after reporting the leakage and activating the automatic detection and warning systems, evacuated the complex at approximately "midnight" and returned to the Little Rock Air Force Base.

3. Rubber boots attached to the platform, which are flexible and were designed to fit against the missile, when a missile is being serviced or under maintenance, in order to prevent objects from falling into the missile well, were not in place. The rubber boots were folded down rather than horizontally against the missile.

4. A second PTS team arrived at the complex, hours after the departure of the first team, wearing gas masks and protective clothing. The team obtained readings

---

1. The Tapleys instituted their action on November 7, 1983. The Lathems instituted their lawsuit on March 20, 1984. These two proceedings were consolidated for trial and final adjudication on the 29th day of November, 1984.

2. Crews customarily take the wrench to the missile complex with them, but remove the socket from a prearranged storage area and fit the socket into the wrench with an adapter to make the socket and wrench secure in the maintenance work to be performed.

from the interior of the control center in order to determine the concentration of vapor in that area and to minimize any actual or potential hazards.

5. The Titan II missile is powered by liquid propellants, hydrazine (UDMH) and an oxidizer, nitrogen tetroxide ($N_2O_4$). The Titan II missile consists of three stages, namely, stage I, stage II and the warhead. Stages I and II contain the propellants. Stage I, in the instant case, contained 11,300 gallons of UDMH and 13,500 gallons of oxidizer.

UDMH is highly toxic and the fumes are flammable or explosive when in high concentration. However, when UDMH is diluted one part fuel with two parts water, the fuel becomes non-flammable. The oxidizer, $N_2O_4$, when released into the atmosphere is a reddish-brown fume and is highly toxic.

6. Breathing oxidizer vapors, even in low level concentrations, can produce serious and permanent injuries. In higher concentrations, it can be fatal. Because of the physical properties of the oxidizer, Air Force personnel who handle the propellant are always outfitted in self-contained atmospheric protective equipment or suits to insure that they are not exposed to the oxidizer.

7. A 100,000 gallon water tank, with a spray mechanism, was located in the missile silo. During an emergency, similar to the one in the instant case, the spray mechanism is activated and water is sprayed into the large duct in order to dilute the fuel and render it non-flammable. During the course of the emergency, the indicator on the spray mechanism demonstrated the need for additional water, but water from a topside storage water tank was prevented from re-supplying the in-silo water tank because of a malfunction previously documented on August 30, 1980.

**3.** At this reading, the PTS team and wing missile potential hazard team (MPHT)—which consists of supervisors and commanders who provide technical information to cope with the emergency—were concerned that the fuel tank would

8. The following are the pressure readings of the fuel and oxidizer tanks in stage I of the missile taken by PTS teams. These readings are relevant in determining, purportedly, the amount of UDMH leakage from the fuel tank, in this proceeding, from which experts are in a position to calculate the vapor accumulation in a relevant area:

September 18, 1980, 6:30 p.m.

Stage I

| | |
|---|---|
| Fuel Tank | 11.5 PSI |
| Oxidizer Tank | 12.0 PSI |

6:40 p.m.

| | |
|---|---|
| Fuel Tank | 9.7 PSI |
| Oxidizer Tank | 13.8 PSI |

7:35 p.m.[3]

| | |
|---|---|
| Fuel Tank | 2.2 PSI |
| Oxidizer Tank | 18.8 PSI |

8:00 p.m.

| | |
|---|---|
| Fuel Tank | .4 PSI |
| Oxidizer Tank | 19.0 PSI |

8:02 p.m.

| | |
|---|---|
| Fuel Tank | Negative .3 PSI |
| Oxidizer Tank | 22.5 PSI |

8:24 p.m.

| | |
|---|---|
| Fuel Tank | Negative .5 PSI |
| Oxidizer Tank | 23.4 PSI |

8:30 p.m. (Crew Evacuates)

| | |
|---|---|
| Fuel Tank | Negative .7 PSI |
| Oxidizer Tank | 23.4 PSI |

9:20 p.m. (Sgt. Kennedy re-entered control center through escape hatch)

| | |
|---|---|
| Fuel Tank | Negative 2 PSI |
| Oxidizer Tank | 29.6 PSI |

collapse inward from a negative pressure and that the oxidizer tank might burst from over pressure causing the two agents, fuel and oxidizer, to mix resulting in a spontaneous explosion (hypergolic reaction).

9. Between 2:25 a.m. and 2:53 a.m., on September 19, 1980, Sergeant Kennedy and T-Sergeant Hanson re-entered the complex in order to obtain readings in the area "between blast door 6 and blast door 7." Upon entering the area, Sergeant Kennedy reported "heavy fog" and could not see the light on the "VDAP", but as he went closer, he observed all "PTM" readings were at maximum level and "the explosive level was at 21,000." Kennedy was told to leave the area.

10. The explosion occurred at 3:00 a.m. o'clock. Missile and missile complex debris were "ejected as far as 2,100 feet from the silo." Part of the silo closure door, which weighed 740 tons when intact, was blown 625 feet to the northwest of the missile complex.

11. Use of a ratchet wrench and socket as opposed to the required use of a torque wrench and socket in the attempted removal of the oxidizer vent pressure cap from the stage II oxidizer tank; the failure of the personnel to secure firmly the socket to the ratchet wrench; the failure to properly secure the rubber boots around the missile well; the use of untrained personnel to perform the relevant assigned task and the failure to have an adequate and operative water spray mechanism were concurrent causes of the explosion.

Stated another way, the disconnected socket caused the fuel leak in the stage I missile. The leakage during eight and one-half hours prior to the explosion, resulted in the flow of an undetermined amount of fuel in the launch duct causing an undetermined heavy concentration of vapor both, inside the launch duct as well as outside the complex at ground level. A fire in the missile engine area and a second fire in the launch duct area developed. Afterwards, stage I of the missile collapsed, because of extremely low pressure or no pressure at all, resulting in the mixture of the fuel with the oxidizer precipitating the explosion. Complex 374–7 and stages I and II of the missile were destroyed.

12. The above designated deficiencies are evidence of the failure of the Air Force to exercise reasonably prudent care under existing circumstances; and these failures constitute negligence; and this was the proximate cause of the injuries sustained by plaintiffs as hereinafter designated.

13. The Court finds that the Tapleys and Lathems were exposed to low level of concentrations of vapor oxidizer resulting in psychological disorders as opposed to any major physical infirmities or injuries. These disorders were temporary in nature as opposed to any permanent or enduring injuries.

## II.

### EXPOSURE OF THE PARTIES

14. The Tapleys were exposed, to a very limited degree, to a small concentration of oxidizer vapors at approximately 4:30 a.m. September 19, 1980, and approximately eight miles east of the missile complex while traveling on Highway 25 near Guy, Arkansas. The duration of this exposure did not exceed ten minutes.

Defendant argues that in view of the prevailing weather conditions, it is "meteorologically impossible" for the Tapleys to have been exposed to the oxidizer vapors. This conclusion is based upon the testimony of Major Clark, Air Force Meteorologist, that at the time of the explosion, the wind flow was to the west and southwest of the missile complex and consequently, "all chemicals from the missile site blew to the southwest at the surface and to the northwest between 1,000 and 4,000 feet." Guy is approximately eight miles east of the missile complex. Defendant further argues that if the Tapleys encountered any fog near Guy it was "smoke or chemical from the northeast, not from the missile site."

The difficulty that the Court faces in accepting Major Clark's testimony as conclusive as to the direction that the oxidizing vapor traveled and the degree of the concentration of the vapor may be briefly summarized as:

(1) Major Clark was not personally present at the missile complex either prior to or immediately following the explosion. His testimony and opinions proferred are based upon information acquired and reported by others who were functioning under extreme and abnormal conditions and involving substantial time lapses that render such data relied upon by Major Clark less than persuasive and probative.

For example, Major Clark testified as follows:

THE WITNESS: Paragraph 5(b) on page two tab RSE, reads, 'Information made available from other sources indicates that a leak of stage one fuel tank released approximately 3700 gallons. The information that was made available was an analysis done by Martin Marietta. And what they used was the—once the wrench was dropped and the leak initiated, the crew was still in the capsule, and they were recording the pressure readings from the stage one tank itself. And they deduced from these pressure readings as they changed a rate of leakage.

Once the crew evacuated, then they didn't have that data at that time until Sergeant Kennedy re-entered the capsule and got another reading, and then they had—I think the last reading when Livingston and Kennedy again re-entered it. So, they deduced the leak rate, and that is how they arrived at—

BY MR. JACKSON:

Q. Kennedy and Livingston were exiting the silo when it blew, right.

A. That is right.

Q. And they were down there taking readings just before that?

A. That is correct.

Q. And how was the volume of fuel leakage deduced from those pressure readings?

A. The vapor pressures, differences between—you know, you've got high pressure to start with, when the leak started and then those pressures kept decreasing and decreasing and decreasing and by the rate at which they decreased, they deduced how much fuel escaped.

The evidence, however, discloses that Sergeant Kennedy re-entered the control center through the escape hatch at 9:20 p.m. (2120) and noted the following pressure reading for the stage I missile: fuel tank—"negative 2 PSI" and oxidizer tank —"29.6 PSI". This reading took place five hours and forty minutes before the explosion.[4]

Between 2:25 a.m. and 2:53 a.m., Sergeant Kennedy and T. Sergeant Hanson re-entered the complex in order to obtain readings in the area "between blast door 6 and blast door 7." Upon entering the area, Sergeant Kennedy reported "heavy fog" and could not see the lights on the "VDAP", but as he went closer, he observed all "PPM" readings were at maximum level and the explosive level was at 21,000. Kennedy was told to leave the area.

The Court is persuaded that neither Martin Marietta nor the Air Force personnel had access to all of the relevant information in order to make an objective determination as to the actual amount of fuel that leaked from the missile during, admittedly, a period of eight and one-half hours. It is plain that Martin Marietta's analysis was based upon a pressure reading that was made approximately five hours and forty minutes before the explosion. The assertion that only 3,700 gallons of fuel had leaked from the fuel tank is mere speculation.

(2) The Court finds that the oxidizer vapors, prior to the explosion, was situated in a circular corridor and following the explosion extended in immediate areas surrounding the missile complex, including the Guy community which lies east of the complex, as opposed to a corridor, as alleged by the

---

4. The stage I fuel tank pressure continued to decrease after 2120 CDT (9:20 p.m.) "below—2.5 PSIG causing the fuel tank forward dome to 'oil can' or collapse by structural failure." See Tab 1–8, joint exhibit 1.

Air Force, in a northwesterly and southwesterly direction of the complex.[5] This finding is based upon evidence indicating that the escape of the vapor into the atmosphere through the exhaust shaft occurred for approximately eight and one-half hours before the explosion and the additional fact that "the wind was light and variable" and calm between 7:35 p.m. on September 18, 1980, and 1:00 a.m. on September 19, 1980. Further, the failure of the water sprinkling system—which would have diluted the fuel pool—enhanced not only the evaporated source strength, but the distance or area beyond the complex.

Arthur Tapley, Betty Tapley, Lisa Tapley and Steven Tapley did not sustain any significant or permanent injuries, as claimed, attributable to the exposure to oxide vapors. This finding credits the studies performed by the doctors at University of Arkansas Medical Center, Dr. Robert Galbraith, a neurologist, Dr. Adamson, Dr. Mack Weavers, Dr. Frank Wilson and Dr. Fincher. While the Court finds that the Tapleys sustained minor and temporary discomfort—nausea, irritation of eyes, nose and throat, and aggravation of a pre-existing asthma condition on the part of Arthur Tapley—their symptoms are chiefly, if not totally, psychological.[6]

## ARTHUR TAPLEY'S LOSS OF INCOME CLAIM

The Court having found that Tapley did not sustain any disability and permanent injuries directly related to or proximately caused from the exposure to oxidizer vapors, Tapley's claim for loss of income as a salesman since the missile explosion and any projected loss in the future is rejected and his complaint should be dismissed with prejudice.

Ray Lathem and Sylba Lathem were exposed to oxide vapors and realized irritation to the eyes, nose, throat and discomfort to the chest area, nausea and dizziness. This condition was temporary and was in no way chronic. The duration of these symptoms did not exceed two weeks.

The Government admits, in its post-trial brief, that Ray Lathem could have been exposed, during the evacuation, to 3.5 parts per million of nitrogen dioxide for a ten minute period; and that his wife, Sylba Lathem, could have been exposed to a maximum concentration of 2.5 parts per million for a ten minute period.

## LATHEM'S CATTLE CLAIM

The Court finds that the three calves and a Guernsey cow that died shortly after the explosion, the three beef cattle that died in 1982 and the dairy herd sold in December, 1980, were the property of M. Lyle Lathem, a son of the Lathems, and that the Lathems have no standing to assert a claim for damages. Significantly, the administrative claim filed with the Air Force indicates that the cattle were owned by the son. Moreover, Mrs. Lathem testified that the 1980 dairy operation loss was reported on her son's 1980 income tax return.

## III.

## DAMAGES

As previously stated, the Court is not persuaded that plaintiffs' injuries were es-

---

**5.** Defendant argues essentially that wind directions and speeds both before and after the explosion carried the vapors away from Guy, Arkansas. But Environmental Health Personnel were notified on September 26, 1980, that a few people in Guy were complaining that a red cloud had passed through their town the morning of September 19, 1980. (See Tab N–12, Joint Exhibit 1).

Moreover, the Government admits in its brief at page 8 in effect that if the pre-explosion fuel leak were greater, then the concentration of nitrogen dioxide would have increased in strength and distance.

Richard Kincaid, an International Business Machines executive who lived near Guy, Arkansas, at the time of the explosion, testified that he and his son encountered patches of foglike substances, intermittently, following the explosion.

**6.** The only medical evidence offered by any of the plaintiffs was the testimony of Dr. R.A. Hinkle of Quitman, Arkansas. Dr. Hinkle has a primary care office practice at Quitman. He is not board certified in any field of medicine and has no association with any hospital.

sentially physical in nature, but it is clear by a preponderance of the evidence that while plaintiffs sustained minor physical injuries, their symptoms are psychological. Therefore, the Court makes the following awards:

ARTHUR TAPLEY:

(a) Personal injury—$5,000.

(b) Mental anguish, suffering and discomfort—$5,000.

BETTY TAPLEY:

(a) Personal injury—$3,000.

(b) Mental anguish, suffering and discomfort—$3,000.

LISA TAPLEY:

(a) Personal injuries—$500.00

(b) Mental anguish, suffering and discomfort—$750.00.

STEVEN TAPLEY:

(a) Mental anguish, suffering and discomfort—$1,000.

RAY LATHEM:

(a) Personal injury in the sum of $5,000.

(b) Mental anguish, suffering and discomfort—$5,000.

SYLBA R. LATHEM:

(a) Personal injury in the sum of $2,500.

(b) Mental anguish, suffering and discomfort—$5,000.

### SUMMARY

The plaintiffs sustained damages as follows:

| | | |
|---|---|---|
| (1) | Arthur Tapley | $10,000.00 |
| (2) | Betty Tapley | $ 6,000.00 |
| (3) | Lisa Tapley | $ 1,250.00 |
| (4) | Steven Tapley | $ 1,000.00 |
| (5) | Ray Lathem | $10,000.00 |
| (6) | Sylba R. Lathem | $ 7,500.00. |

### CONCLUSIONS OF LAW

The following conclusions of law are found by the Court:

1. That the Court has jurisdiction over this claim and the parties herein. Title 28 U.S.C. § 1346(b).

2. The law of the state where the misconduct occurred governs the substantive tort liability and the nature and measure of damages to be awarded. In this proceeding, Arkansas is the place of the misconduct in addition to being the forum state.

3. Arkansas Law provides that, if two or more causes work together to produce damage, each of them may be a proximate cause.

4. When the negligent acts or omissions of two or more persons work together as proximate causes of damages to another, each of those persons may be found to be liable. In this case, the negligence of the Government proximately caused damage to the plaintiffs and it is not a defense that some other person may also have been to blame. *Beevers v. Miller*, 242 Ark. 541, 414 S.W.2d 603 (1967). *See,* Woods, *Comparative Fault,* § 13.4 (1978).

5. Part of the Government's defense in this action is that the plaintiffs' problems are psychological rather than physical.

Arkansas Law provides that the plaintiffs are entitled to damages for the full extent of any injury sustained even though the degree of injury may have resulted from the aggravation of an emotional condition that already existed and that predisposed the plaintiffs to injury.

6. The Court is persuaded that plaintiffs have met their burden of proving, by preponderance of the evidence, that their injuries resulted from the exposure to the oxidizer vapors.

7. Plaintiffs were not guilty of any negligence which was the proximate cause of their injuries.

8. Arthur Tapley's claim for loss of income is dismissed with prejudice.

9. The claim of Sylba R. Lathem for loss of cattle, income and expenditures in the maintenance of the cattle is dismissed with prejudice.

10. A judgment is entered this date in behalf of plaintiffs for the damages found and awarded in accordance with this memorandum opinion and order.